UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/10/25

GHASSAN ALBERT HREISH JR., et al.

　　　　　Plaintiffs,

-against-

STEVE PAPPAS, et al.,

　　　　　Defendants.

24-CV-2284 (JHR) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

In this corporate control dispute, referred to me for general pretrial management, plaintiffs Ghassan Albert Hreish, Jr., Team Group LLC (Team), Daniel P. Bourke, Walter V. Gerasimowicz, and Envirokare Composite Corp. (ECC or the Company) seek declaratory relief and damages against defendants Steve Pappas, George E. Kazantzis, and Gregory J. Angelides arising from what plaintiffs describe as defendants' unlawful attempt to take over ECC in January 2024. Defendants deny any wrongdoing and, in their counterclaims, seek declaratory relief and damages against the individual plaintiffs, both on their own behalf and derivatively on behalf of ECC. Each side claims, among other things, that it rightfully controls the Company.

Now before me for determination is defendants' motion to disqualify plaintiffs' attorney Jonathan Miller on the ground that his representation of the individual plaintiffs and the Company subjects him to multiple conflicts of interest, which cannot be waived because there are no disinterested corporate officials capable of consenting to the concurrent representation. Defendants further contend that the individual plaintiffs may have given attorney Miller privileged information or documents, which could be used against them. Plaintiffs oppose the disqualification motion and seek an award of their fees incurred in responding to it, arguing that the motion was filed for improper tactical reasons. For the reasons that follow, the disqualification motion will be denied, but no sanctions will be imposed.

I.    **BACKGROUND**

A.    **Factual Background**

1.    **The Company**

ECC is a Nevada corporation whose only asset is the potential value of a stalled shareholder derivative lawsuit pending in Delaware Chancery Court. *See* Am. Compl. (Dkt. 55) ¶ 3. ECC was formed in 2010 by defendants Pappas and Kazantzis. *Id*. ¶¶ 24-25. Kazantzis served briefly as ECC's President, Secretary, and a director, but resigned all of his corporate positions in March 2010. *Id*. ¶ 28. Pappas, who was also a director, took over as President and Secretary upon Kazantzis's resignation. *Id*. ¶ 29.

In or around 2017, Pappas and Kazantzis entered into an agreement with plaintiff Hreish whereby Hreish would provide funding for the planned Delaware lawsuit and, in exchange, would receive equity in ECC and a board seat. Am. Compl. ¶¶ 3, 34. Pursuant to that agreement, Hreish "provided over $200,000.00 in litigation funding to ECC through Hreish's solely owned company, Team." *Id*. at 3. However, according to plaintiffs, Pappas and Kazantzis failed to disclose several unsavory episodes from Pappas's past, including (i) that in 2005 he was sued by ECC's predecessor, Envirokare Tech, Inc. (ENVK), after which he signed a standstill agreement promising not to serve as an officer of ENVK or any of its affiliates for five years, and (ii) that in 2016 he was charged with securities fraud by the SEC, admitted liability, was fined $50,000, and accepted a five-year ban on serving as an officer or director of any publicly traded company. *Id*. ¶¶ 20-38; *see also* Miller Cert. (Dkt. 106) Ex. 24 (Dkt. 106-24) (copy of *In re Steve Pappas*, SEC Admin. Proc. No. 3-17194 (Apr. 5, 2016)).

In or around January 2020, Pappas, who was then acting as ECC's sole director, appointed Kazantzis, Hreish, and Bourke as additional directors. Am. Compl. ¶¶ 39-40. All four directors were "actively involved" in making decisions about the Delaware lawsuit. *Id*. ¶ 40. In October 2021, Pappas "was forced to resign" all of his corporate positions (for reasons not disclosed in the pleadings), and plaintiff Gerasimowicz was appointed to take his place as a director. *Id*. ¶¶ 42-43, 60. Kazantzis then took over the role of President, and plaintiffs Hreish and Bourke became ECC's Secretary and Treasurer, respectively. *Id*. ¶ 44; *see also* Miller Cert. Ex. 3 (Dkt. 106-3) (ECC's 2022 Annual List, signed under penalty of perjury by Kazantzis, listing Kazantzis, Hreish, Bourke, and Gerasimowicz as the Company's directors and Kazantzis, Hreish, and Bourke as its officers).

### 2.    The Control Contest

The parties' dispute centers on a series of rapid moves to assert control of ECC in December 2023 and January 2024. At the beginning of this period, the Company had four directors: plaintiffs Hreish, Bourke, and Gerasimowicz, and defendant Kazantzis. Am. Compl. ¶¶ 44, 59. Kazantzis was ECC's President; Hreish was Secretary; and Bourke was Treasurer. *Id*. ¶ 44; *see also* Miller Cert. Ex. 4 (Dkt. 106-4) (ECC's 2023 Annual List, signed under penalty of perjury by Kazantzis, and identical to the 2022 Annual List).

In December 2023 – for reasons not disclosed in the pleadings – Hreish, Bourke, and Gerasimowicz voted to remove Kazantzis as President, and on January 4, 2024, they "stripped [him] of all authority to conduct any business on behalf of ECC and/or the Board[.]" Am. Compl. ¶¶ 45-46. In response, on January 6, 2024, Kazantzis – who was still a director – "purported to convene an annual stockholders' meeting" in Brooklyn, New York, but did not notify any of the other directors (even Gerasimowicz, who was also a stockholder). *Id*. ¶¶ 49-53; *see also* Miller

Cert. Ex. 11 (Dkt. 106-11) (Notice of Annual Meeting, signed by Kazantzis as "President and Director"). During the meeting, the stockholders purportedly removed all three individual plaintiffs from the Board of Directors; replaced them with defendant Angelides; "reaffirmed" Kazantzis's appointment as President (and also appointed him Treasurer), "as per" an employment agreement dated October 20, 2021; and appointed Angelides as Secretary. Am. Compl. ¶ 54; *see also* Miller Cert. Ex. 12 (Dkt. 106-12) (1/6/24 Minutes) at ECF pp. 4-5. On January 11, 2024, Kazantzis attempted to file an annual registration statement in Nevada listing only himself and Angelides as ECC's officers and directors. Am. Compl. ¶ 56. Hreish, Bourke, and Gerasimowicz then "removed Kazantzis from ECC's true Board due to his misconduct, and Gerasimowicz reported Kazantzis's fraud to the Office of the Nevada Secretary of State." *Id*. ¶ 58.[1]

According to plaintiffs, the "alleged vote" at the January 6, 2024 meeting was "a legal nullity" because, among other things, Kazantzis was not authorized to convene an annual stockholders' meeting without the knowledge of the other three directors and notice to *all* stockholders. Am. Compl. ¶¶ 53, 55; *see also* Miller Cert. Ex. 9 (Dkt. 106-9) (ECC Bylaws) § 1 (stating that the annual meeting is to be held in "Clark County, Nevada, or at such other place as the Board of Directors may designate . . . on a day to be fixed by the Board of Directors," and that notice must be sent to "each of the stockholders of record").[2] Plaintiffs further allege that, prior to

---

[1] As of January 14, 2025 (when Nevada's business search portal was last updated), the directors of ECC were still listed as Hreish, Bourke, Gerasimowicz and Kazantzis. However, the corporation is on "administrative hold." *See* https://esos.nv.gov/EntitySearch/OnlineEntitySearch (last visited June 10, 2025).

[2] Plaintiffs also question whether a quorum was present on January 6, 2024. According to the minutes – signed by Angelides and witnessed by Pappas and Kazantzis – the three individual defendants were the only stockholders to attend that meeting in person. 1/6/24 Minutes at ECF p. 1. The minutes go on to state that several dozen additional ECC stockholders were "represented

January 2024, they knew nothing about the "alleged employment agreement" between Kazantzis and ECC, Am. Compl. ¶¶ 59, 62, which was "purportedly signed" by Pappas on behalf of ECC just seven days prior to his resignation in 2021. *Id.* ¶ 60. The agreement designates Kazantzis President of ECC through December 31, 2024 (subject to automatic 12-month extensions thereafter) in exchange for an annual salary of $165,000, payable in cash or through the issuance of a "Company Convertible Promissory Note" each year. *Id.* ¶ 59; *see also* Miller Cert. Ex. 7 (Kazantzis Agreement) (Dkt. 106-7) ¶¶ 1, 2, 4. Plaintiffs contend that the Kazantzis Agreement, having never been approved by the Company's "true Board," is also a "legal nullity." Am. Compl. ¶¶ 65, 89. They further charge, on information and belief, that the document "appears to have been forged and/or backdated." *Id.* ¶¶ 5-6.

### B.    Procedural Background

On March 26, 2024, Hreish (on behalf of himself and derivatively on behalf of ECC) and Team commenced this action against Pappas, Kazantzis, and Angelides, alleging that Hreish and Team were "conned" into investing in ECC "based on the false premise that their equity investment would entitle them to majority shareholder status," and that Hreish, Team, and ECC were harmed by "Pappas and Kazantzis's misconduct and omissions," including "the very existence of the Alleged Kazantzis Employment Agreement" and "Kazantzis's unlawful claims to compensation thereunder." Compl. (Dkt. 1) ¶¶ 63-67. Plaintiffs sought declaratory judgments as to the true

---

by proxy," such that "[a] total of approximately 59.5% of the outstanding shares were represented at the stockholder's meeting." *Id.* at ECF pp. 1-2. However, despite vigorous discovery efforts by plaintiffs, defendants have yet to produce signed proxies from all of the absent stockholders listed in the minutes. *See* Pl. 6/4/25 Ltr. (Dkt. 124) at 2. Two of the proxies that were produced in discovery "were not signed until several days *after* the purported election, and the remainder appear to have been pre-dated by Kazantzis as '12/23/2023' instead of being dated by the shareholders themselves." *Id.*

composition of ECC's Board of Directors and the invalidity of the Kazantzis Agreement (Counts I and II), and damages for defendants' failure to disclose "Pappas's history of corporate wrongdoing and misconduct" and the existence of the Kazantzis Agreement (Counts III and IV). Additionally, plaintiffs asserted claims for breach of fiduciary duty and civil conspiracy (Counts V and VI), both also arising out of defendants' conduct in entering into and concealing the Kazantzis Agreement. Compl. ¶¶ 68-120.

On August 16, 2024, defendants sought leave to file a motion to dismiss on the ground that Hreish and Team lacked standing to bring derivative claims because they were not ECC shareholders. (Dkt. 35.) Plaintiffs advised that they intended to amend their pleading (*see* Dkt. 42 at 2), and did so on October 7, 2024, filing the Amended Complaint, which remains their operative pleading. The Amended Complaint is almost identical to the original Complaint, except for the addition of Bourke and Gerasimowicz as plaintiffs on Count I (seeking a declaratory judgment that the three individual plaintiffs comprise "ECC's true Board of Directors," Am. Compl. ¶¶ 72-81), and the conversion of ECC from a nominal defendant to a named plaintiff in Count I, Count II (seeking a declaration that the "Kazantzis Agreement is a legal nullity," *id*. ¶¶ 82-91), and Count V (seeking damages from Pappas and Kazantzis for secretly executing the Kazantzis Agreement in breach of their fiduciary duties and conspiring to do so, *id*. ¶¶ 113-23).

On November 12, 2024, defendants filed an amended answer (Dkt. 61 at ECF pp. 1-10), together with ten counterclaims (Countercl.) (Dkt. 61 at ECF pp. 10-21), as follows: (1) by Kazantzis against Gerasimowicz for breach of a personal promissory note entered into in 2017; (2) by Kazantzis against Hreish and ECC for defamation, arising out of a letter that Hreish wrote to the ECC shareholders on June 30, 2024; (3) by Pappas against Hreish and ECC for defamation,

arising out of the same letter; (4) by all three defendants against Gerasimowicz for breach of fiduciary duty, because he "authorized this action" for "his own personal benefit" rather than for the benefit of the Company; (5) by all three defendants against all three individual plaintiffs for breach of fiduciary duty, on the theory that they are "acting solely in their own best interests and not in the interests of [ECC]"; (6) by all three defendants derivatively, on behalf of the Company, against the individual plaintiffs for "commandeering control" of ECC and "wrongfully managing [it] for their own personal gain"; (7) by all three defendants for a declaratory judgment that Gerasimowicz is not entitled to indemnification by ECC for his costs and fees incurred in defending against Counterclaim 1 (for breach of the promissory note); (8) by all three defendants for a declaratory judgment that because Hreish, Bourke, and Gerasimowicz are wrongfully acting as the directors and officers of ECC, they are not entitled to indemnification by ECC for their defense of any counterclaims; (9) by all three defendants for a declaratory judgment that Hreish is not entitled to indemnification by ECC for his costs and fees incurred in defending against Counterclaims 2 and 3 (for defamation); and (10) by all three defendants for a declaratory judgment "declaring their rights as officers and directors of [ECC]." Countercl. ¶¶ 144-198.[3]

On December 6, 2024, Judge Reardon referred this action to me for general pretrial management. (Dkt. 76.) During the initial case management conference on January 22, 2025, defendants advised that they intended to move to disqualify opposing counsel. I directed them to

---

[3] On December 4, 2024, plaintiffs moved to dismiss Counterclaim 6 (the derivative claim) for failure to meet the pleading requirements of Fed. R. Civ. P. 23.1; to dismiss Counterclaims 7, 8, and 9 (regarding the individual plaintiffs' hypothetical indemnification requests) for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1); and to sever Counterclaim 1 (arising out of Gerasimowicz's personal promissory note) and transfer it to the Eastern District of Pennsylvania, where Gerasimowicz resides. (Dkt. 69.) The motion is unopposed and pending before the Hon. Jennifer H. Reardon, United States District Judge.

do so no later than February 5, 2025, and reminded them that unless they can show that "a threat of taint to the [proceedings] exists, possible ethical conflicts arising during litigation are to be addressed by state and federal bar disciplinary mechanisms." Initial Case Mgmt. Order (Dkt. 87) ¶ 2 (quoting *Araujo v. Macaire*, 2018 WL 4300525, at *4 (S.D.N.Y. 2018)).

### C.    The Motion to Disqualify

Defendants filed their disqualification motion on February 6, 2025. (Dkt. 92.) In their supporting memorandum, they contend that attorney Miller's concurrent representation of ECC and the individual plaintiffs "creates impermissible conflicts of interest," Def. Mem. (Dkt. 93) at 4, under Rule 1.7 of the New York Rules of Professional Conduct (RPC), 22 N.Y. Codes R. & Regs. § 1200.0. As relevant here, that rule provides that "a lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests." RPC 1.7(a)(1). Defendants argue that as to some of plaintiffs' claims, the interests of the Company "may differ" from those of the individual plaintiffs, such that if ECC had separate legal counsel it might take a different legal position or pursue settlement over litigation. Def. Mem. at 6-7. Further, defendants point out, as to certain counterclaims – for example, Counterclaims 7, 8, and 9, which ask the Court to declare that the individual plaintiffs are not entitled to indemnity from ECC for their fees and costs incurred in defending themselves against other counterclaims – the Company's interests are in "direct conflict" with those of the individual plaintiffs. *Id.* at 7. Defendants add that the concurrent representation violates counsel's "duty of confidentiality" because the individual plaintiffs "are giving Attorney Miller access to privileged information and documents which could be used against the Defendants." *Id.* at 8-9.

A lawyer may represent clients with conflicting interests if, among other things, "each affected client gives informed consent, confirmed in writing." RPC 1.7(b)(4). However, where the jointly-represented clients include a corporation and its individual officers or directors, the corporation's consent must be given "by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders." RPC 1.13(d). In this case, defendants assert, "there is no unrepresented individual to consent to the concurrent representation" on behalf of ECC, such that, if RPC 1.7 has been violated, "disqualification is mandated." Def. Mem. at 5.

Plaintiffs filed their opposition memorandum (Pl. Opp.) (Dkt. 96) on February 18, 2025, supported by the Certification of Daniel P. Bourke, attesting, among other things, that the Kazantzis Agreement was never discussed or approved by the Board of Directors in 2021, and that Kazantzis did not "begin to claim that he had a contract and was entitled to compensation thereunder" until after the board "removed him as President in December 2023." Bourke Cert. (Dkt. 97) ¶¶ 5-7.[4] In their brief, plaintiffs argue principally that there is no disqualifying conflict between ECC and the individual plaintiffs, *see* Pl. Opp. at 5-11, and that in any event defendants have not shown any risk of trial taint. *Id*. at 13-14. Plaintiffs characterize the instant motion as a "transparently abusive ploy" meant to distract the Court from defendants' failure to support their claims or defenses on the merits, *id*. at 14-15,[5] and request sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent authority. *Id*. at 16-18. Defendants did not file any reply brief.

---

[4] Plaintiffs also submitted a certification, signed by Mr. Miller, attaching copies of the Annual Lists submitted by ECC to the Nevada Secretary of State from 2020 through 2023. (Dkt. 98.)

[5] Plaintiffs are correct that defendants have done remarkably little to defend against plaintiffs' claims or advance their own counterclaims. As noted above, defendants did not file any opposition to plaintiffs' motion to dismiss Counterclaims 6-9 and sever Counterclaim 1. On March 25, 2025, plaintiffs filed a motion for partial summary judgment on Counts I and II of the Amended

During a conference before this Court on May 5, 2025, the parties confirmed that there had been "no activity" in the Delaware action for nearly a year, because – thanks to ECC's corporate deadlock – "there's no money" to pay counsel, putting the case at risk of dismissal. 5/5/25 Tr. (Dkt. 119) at 28:11-29:23.[6] *See also* Miller Cert. Ex. 12 (Dkt. 106-12) (docket of Delaware action, showing no activity since May 20, 2024). During the same conference, defendants' counsel acknowledged that their disqualification motion turns upon the merits of the case: "*If* my clients are the true management of the company, Mr. Miller representing the company and other people who . . . claim to be management is a conflict." 5/5/25 Tr. at 77:3-6 (emphasis added); *see also id*. at 78:21-25.

At the conclusion of the conference, the Court asked for supplemental briefing to address the apparent inconsistency, within defendants' pleading, as to whether they are or are not the "true stewards of ECC." 5/5/25 Tr. at 79:2-80:10.[7] On May 12, 2025, defendants submitted a supplemental letter-brief, but it fails to address this issue. Instead, defendants reiterate their RPC

_____

Complaint and Counterclaims 2, 3, and 10. (Dkt. 103.) Once again, defendants did not file any opposition. Although defendants have responded to plaintiffs' discovery requests, they have done so slowly and incompletely. On May 5, 2025, this Court issued an order compelling defendants to produce additional documents and update their written discovery responses. (Dkt. 118.) On June 4, 2025, plaintiffs moved for discovery sanctions, asserting that defendants have failed to comply with the May 5 Order. Pl. 6/4/25 Ltr. at 1. That motion remains pending. Insofar as the record reflects, defendants have conducted no discovery of their own.

[6] Defendants' counsel elaborated: "[T]here's nothing to this corporation except a fight over who runs it, a bunch of stockholders and this lawsuit. There's no ongoing business at all. There hasn't been for years." 5/5/25 Tr. at 31:23-32:2.

[7] *Compare* Countercl. ¶ 183 (alleging, for purposes of defendants' derivative counterclaim, that Hreish, Bourke, and Gerasimowicz "control the Board of Directors," such that making a demand on the board would be futile) *with id*. ¶ 197 (alleging, for purposes of defendants' declaratory judgment counterclaim, that Pappas, Kazantzis and Angelides are "the duly elected and appointed officers and directors" of ECC).

1.13(d) argument, adding that "shareholder consent" for the concurrent representation "was not obtained" and, in defendants' view, "could not be obtained[.]" Def. Supp. (Dkt. 121) at 2.

In their own supplemental filing, plaintiffs argue that "Defendants' contention that they, and not the Individual Plaintiffs, sit on ECC's board is fatal to their disqualification arguments," because if defendants are correct, it would simply mean that the individual plaintiffs "lack legal capacity" to retain attorney Miller (or anyone else) on behalf of the Company, or to take any litigation position in its name. Pl. Supp. (Dkt. 122) at 2. Thus, plaintiffs reason, "[t]he logic of Defendants' position, if credited by the Court, would lead not to attorney disqualification but rather to the conclusion that ECC's participation in this Matter, with or without [Miller's] representation, is a legal nullity," in which case "ECC must simply be stricken from the case caption." *Id.*

## II.    LEGAL STANDARDS

"The question of whether to disqualify counsel is solely within the Court's discretion." *Brooks v. Knowledge Eng'g Inc.,* 1994 WL 121851, at *2 (S.D.N.Y. Apr. 7, 1994) (Sotomayor, J.).[8] Although disqualification decisions are frequently informed by the applicable rules of professional conduct, "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005). Courts in this Circuit "show considerable reluctance to disqualify attorneys," in part because "disqualification motions are often interposed for tactical reasons and even when made in the best of faith . . . inevitably cause delay." *Razzoli v.*

---

[8] A motion to disqualify counsel is a non-dispositive matter within the scope of a magistrate judge's authority pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a). *See Heard v. Statue Cruises LLC*, 2020 WL 1285456, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) (collecting cases).

*City of New York*, 2021 WL 162029, at *1 (S.D.N.Y. Jan. 19, 2021) (quoting *Sanchez v. Hoosac Bank*, 2014 WL 1326031, at *2 (S.D.N.Y. Mar. 31, 2014)) (cleaned up).

In the Second Circuit, "disqualification is called for only where 'an attorney's conduct tends to taint the underlying trial,' because federal and state disciplinary mechanisms suffice for other ethical violations." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) (quoting *Bd. of Ed. of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). As the Second Circuit has repeatedly explained: "[D]isqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests . . . undermines the court's confidence in the vigor of the attorney's representation of his client, . . . or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation. . . ." *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764-65 (2d Cir. 1990)) (quoting *Nyquist*, 590 F.2d at 1246) (first ellipsis added).

A party seeking disqualification must meet a "heavy burden of proof in order to prevail." *Razzoli*, 2021 WL 162029, at *1 (quoting *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 126 F. Supp. 3d 413, 419 (S.D.N.Y. 2015)); *see also Scantek Med., Inc. v. Sabella*, 693 F. Supp. 2d 235, 238 (S.D.N.Y. 2008) (motions to disqualify "are subject to particularly strict scrutiny"); *Intellipayment, LLC v. Trimarco*, 2016 WL 1239261, at *4 (E.D.N.Y. Mar. 29, 2016) (movant must satisfy a "high standard of proof."). "[M]ere speculation" regarding the need for disqualification is insufficient. *Gormin v. Hubregsen*, 2009 WL 508269, at *2 (S.D.N.Y. Feb. 27, 2009) (quoting *NL Indus., Inc. v. PaineWebber, Inc.*, 1990 WL 43929, at *1 (S.D.N.Y. Apr. 9, 1990)); *accord Paretti v. Cavalier Label Co.*, 722 F. Supp. 985, 987 (S.D.N.Y. 1989).

Where, as here, the motion is based on RPC 1.7(a), the movant must demonstrate the existence of an actual conflict, not merely "the possibility that future conflicts of interest may arise." *Drag Racing Techs., Inc. v. Universal City Studios, Inc.*, 2003 WL 1948798, at *4 (S.D.N.Y. Apr. 24, 2003); *see also Galante v. Mercedes Benz of Massapequa, LLC*, 2022 WL 1019007, at *8 (E.D.N.Y. Jan. 20, 2022) (denying disqualification motion premised on a "hypothetical future conflict"); *Burger v. Health Ins. Plan of Greater N.Y.*, 1988 WL 60267, at *6 (S.D.N.Y. June 7, 1988) ("An attorney may represent multiple clients until an actual conflict exists."). Similarly, disqualification motions premised on the continuing viability of specific claims or counterclaims may be denied – particularly in the early stages of the litigation – as premature. *See*, *e.g.*, *Cassini v. Cnty. of Nassau*, 2023 WL 6958795, at *5 (E.D.N.Y. Oct. 20, 2023) (denying motion to disqualify defendants' counsel as premature where the court "has not yet ruled on the viability of Plaintiff's claims"); *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 2010 WL 2243351, at *7 (E.D.N.Y. June 1, 2010) (denying motion where "the conflict of interest raised by Defendants is too speculative at this point in the litigation to require disqualification"), *adhered to,* 2011 WL 13254531 (E.D.N.Y. Mar. 30, 2011); *Burger*, 1988 WL 60267, at *6 ("The resolution of the motions to amend and to dismiss the pendent claims demonstrates the prematurity of this motion.").

## III.    ANALYSIS

### A.    Conflicts of Interest

Plaintiffs are largely correct that defendants' disqualification motion turns on "[s]peculation about hypothetical conflicts that might arise" in the future, Pl. Opp. at 8, rather than actual conflicts that present a risk of trial taint. For example, defendants argue that attorney Miller

is conflicted with respect to Count II (in which ECC seeks a declaratory judgment that the "fraudulent and unlawful Kazantzis Agreement is null and void") and Count IV (in which Hreish and Teams seek damages for defendants' failure to disclose the Kazantzis Agreement) because "[t]he corporation's interests in . . . honoring [ECC's] employment agreements *may* differ from the personal interests of [the individual plaintiffs] who stand financially to benefit from this action continuing." Def. Mem. at 6 (emphasis added). Defendants explain that the Company, if separately advised, "might" wish to settle with Kazantzis on Count II, but "Hreish, Gerasimowicz, and Bourke might prefer to press forward to potentially receive financial benefit under Count IV." *Id.*[9]

No disqualifying conflict is presented here. If ECC prevails on Count II, it will be relieved of any obligation to pay Kazantzis $165,000 per year (or issue promissory notes to him). If Hreish and Teams prevail on Count IV, they will be awarded damages against Kazantzis and/or Pappas. These goals do not conflict in any way. Nor do defendants identify any legal or factual inconsistency between the two claims that might at some point require attorney Miller to favor one at the expense of the other. Thus, Counts II and IV do not "involve [attorney Miller] in representing differing interests." RPC 1.7(a)(1); *see also Baliga v. Link Motion Inc.*, 2024 WL 5497632, at *17 (S.D.N.Y. Nov. 25, 2024) (where interests of corporation and individual corporate officer and director were aligned with respect to a claim asserted against both, one lawyer could jointly represent them), *adopted in relevant part,* 2025 WL 1430587 (S.D.N.Y. May 19, 2025). And while it is of course true that civil litigants whose interests are otherwise aligned "may" have different

---

[9] Defendants appear to have misread Count IV. That count is asserted only by Hreish and Teams, who allege that they invested time and money in ECC – including by funding the Delaware lawsuit – which they would not have done "had they known about the Kazantzis Agreement." Am. Compl. ¶ 109.

approaches to settlement (if and when a settlement opportunity presents itself), the mere possibility of future disagreements over hypothetical settlement offers not yet made does not require advance disqualification of plaintiffs' counsel. *See Walton v. Diamond*, 2012 WL 6587723, at *2 (N.D. Ill. Dec. 14, 2012) (denying disqualification motion where "[t]his case is early in the proceedings and defendants' . . . settlement prospects are unclear"); *Galante*, 2022 WL 1019007, at *8 (denying disqualification motion premised on a "hypothetical future conflict").[10]

Next, defendants argue that Counterclaims 7, 8, and 9 (which ask the Court to declare that the individual plaintiffs are not entitled to indemnification from ECC for their fees and costs incurred in defending themselves against other counterclaims) "clearly place the interests of [ECC] in direct conflict with the interests of the other Plaintiffs." Def. Mot. at 7. *If* the individual plaintiffs were to seek indemnification from ECC for this purpose, and *if* ECC had any funds with which to advance or reimburse the individual plaintiffs for their legal fees and costs, defendants would be correct. However, there is no suggestion in the record that any individual plaintiff has sought indemnification from ECC (or plans to do so). Nor, for that matter, do defendants allege any such efforts (or plans) in their pleading. *See* Countercl. ¶¶ 185-98.[11] Once again, therefore, defendants

---

[10] Even where a defendant in a multi-plaintiff case makes a concrete settlement offer that benefits less than all of the jointly-represented plaintiffs, it does not necessarily create a conflict of interest for plaintiffs' counsel. *See, e.g.*, *Vilella v. PUP Culture LLC*, 2024 WL 1407059, at *3 (S.D.N.Y. Apr. 2, 2024) (fact that one plaintiff was offered an individual settlement, which he accepted and then attempted to enforce, did not create a disqualifying conflict for law firm representing all plaintiffs); *Pagan v. C.I. Lobster Corp.*, 549 F. Supp. 3d 356, 361 (S.D.N.Y. 2021) (fact that one plaintiff was offered an opportunity to settle "for himself alone," which he rejected, did not require disqualification of plaintiffs' counsel).

[11] Moreover, as noted above, defendants freely concede that ECC has no funds with which to satisfy any claim for indemnification.

seek disqualification based on what is, at best, a "possibility that future conflicts of interest may arise." *Drag Racing Techs.*, 2003 WL 1948798, at *4.

In this instance, moreover, the alleged conflict arises entirely from defendants' questionable decision to interpose counterclaims which – in effect – ask this Court for advisory opinions on a wholly hypothetical set of facts. Because there is no actual "case or controversy" underlying Counterclaims 7-9, as required for subject-matter jurisdiction in the federal courts, plaintiffs will likely succeed on their (unopposed) motion to dismiss them pursuant to Rule 12(b)(1), at which point, even the hypothetical conflict posited by defendants will disappear.[12] At a minimum, it would be premature for this Court to seriously consider whether Counterclaims 7-9 "place the interests of [ECC] in direct conflict with the interests of the other Plaintiffs," Def. Mem. at 7, before the district judge has ruled on the viability of those counterclaims. *See Cassini*, 2023 WL 6958795, at *5; *Burger*, 1988 WL 60267, at *6.

Finally, defendants argue that attorney Miller is conflicted because he now represents ECC as a plaintiff on Counts I, II, and V, after initially pleading the same claims on its behalf derivatively. Def. Mem. at 7. To the extent defendants believe that the amendment substantively realigned the parties, *see id.* at 2 ("the abrupt recharacterization of the lawsuit . . . place[s] [ECC] in direct alignment with . . . Hreish, Gerasimowicz, and Bourke[]"), they are mistaken. As plaintiffs point out, the Company's original designation as a nominal defendant was merely "a pleading

---

[12] *See* Memorandum of Law in Support of Plaintiff's Motion to Dismiss and Sever Counterclaims (Pl. MTD Mem.) (Dkt. 70) at 8-9 (arguing that Counterclaims 7-9 do not present any "case" or "controversy," as required by U.S. Const. art. III, § 2, because defendants "merely speculate" that plaintiffs "may" seek indemnification "at some point in the indefinite future"). Plaintiffs further argue that defendants lack standing to bring Counterclaims 7-9, in that any injury flowing from an indemnification demand by plaintiffs would be an injury to ECC, not to Pappas, Kazantzis or Angelides individually. *Id.* at 9.

formality characteristic of derivative actions," Pl. Opp. at 6, and did not suggest in any way that its *interests* were aligned with those of defendants Kazantzis, Pappas, and Angelides. *See Grgurev v. Licul*, 229 F. Supp. 3d 267, 282 n.10 (S.D.N.Y. 2017) (this is the "default way in which corporations are initially joined in shareholder derivative actions"). Indeed, the "general rule" in derivative litigation is that after the corporation is joined as a defendant, it is "aligned as a plaintiff," for diversity purposes, "since it is the real party in interest." *ZB Holdings, Inc. v. White*, 144 F.R.D. 42, 45 (S.D.N.Y. 1992) (citation omitted); *see also Grgurev*, 229 F. Supp. 3d at 282 n.10 ("[A]s a practical matter, the corporation is initially named as a defendant. In this way the stockholder insures the presence of the corporation as an indispensable party. Once joined and present before the court, the corporation is then realigned, if necessary, according to its real interests.") (quoting *Liddy v. Urbanek*, 707 F.2d 1222, 1224 (11th Cir. 1983)). Thus, the fact that Miller previously represented the individual plaintiffs suing derivatively on behalf of ECC does not disable him from now representing ECC and the individuals as co-plaintiffs.[13]

Alternatively, to the extent defendants contend that ECC *should* be aligned with them (because they are its "duly elected and appointed officers and directors," Countercl. ¶ 197), rather than with the individual plaintiffs (who "have not been duly elected or appointed," *id*. ¶ 174), that

---

[13] Defendants, on the other hand (and, by extension, their counsel) appear to be facing a real conflict, because the counterclaims, as currently pleaded, advocate both for and against the interests of ECC. In Counterclaim 6, defendants sue the individual plaintiffs derivatively, *on behalf of* ECC, seeking damages "in an amount no less than $10 million." *See* Countercl. ¶¶ 180-85. Any damages awarded on this claim would be paid *to* ECC. But in Counterclaims 2 and 3, defendants seek defamation damages (also "in an amount no less than $10 million") *from* ECC. *Id*. ¶¶ 153-164. Any damages on this claim would be paid *by* ECC. As plaintiffs explain in their pending motion to dismiss, this conflict runs afoul of Rule 23.1(a). *See* Pl. MTD Mem. at 4-5; *Wall St. Sys., Inc. v. Lemence*, 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005) ("[A]n individual shareholder has a conflict of interest, and therefore cannot adequately represent other shareholders, when he simultaneously brings a direct and derivative action, as Lemence has done here.").

goes to the merits of the claims and counterclaims in this action, and cannot be the basis of a disqualification motion made before the merits have been tested. *See Araujo*, 2018 WL 4300525, at *5 (denying disqualification motion based on assertions that "go to the merits of the claims and counterclaims in this action").

As in *Araujo*, moreover, the disqualification of plaintiffs' present attorney would not provide any relief for defendants, because – as they concede – it is the individual plaintiffs who now "control the Board of Directors" of ECC. Countercl. ¶ 183. Consequently, it is the individual plaintiffs who would select and instruct any new counsel retained to represent ECC. *See Araujo*, 2018 WL 4300525, at *5 (denying defendant's disqualification motion where "any replacement attorney" for the corporate plaintiff "would be chosen by" the individual plaintiffs); *Kleeberg v. Eber*, 2019 WL 2284724, at *10 (S.D.N.Y. May 29, 2019) (denying plaintiff's disqualification motion where any new counsel retained to represent the corporate defendants would continue to act at the "behest" of the individual defendants); *Obeid ex rel. Gemini Real Est. Advisors v. La Mack*, 2015 WL 7180735, at *2 (S.D.N.Y. Nov. 9, 2015) (denying plaintiffs' disqualification motion where "a mandated change of counsel would not improve matters" because "any replacement attorney would be chosen by [the individual defendants], and would be subject to their direction."). Here, as in *Araujo*, *Kleeberg*, and *Obeid*, disqualification would simply "cause unnecessary delay and waste resources." *Araujo*, 2018 WL 4300525, at *5.

## B.    Duty of Confidentiality

Separately from their conflict argument, defendants assert that attorney Miller's concurrent representation of ECC and the individual plaintiffs constitutes a breach of his "duty of confidentiality." Def. Mem. at 8. According to defendants, the individual plaintiffs "are giving

Attorney Miller access to privileged information and documents which can be used against the Defendants, violating the rights of both [ECC] and the Defendants." *Id*. at 8-9.

It is difficult for the Court to parse defendants' confidentiality argument, because they do not specify what "privileged information and documents" they believe attorney Miller has accessed, much less how that information could be used to "violat[e] the rights" of defendants or ECC. If their claim is that plaintiffs' counsel is in a position to use privileged information belonging to *plaintiffs* against *defendants*, they fail to raise any ethical issue. The ethical rules do prohibit an attorney from using confidential information obtained from a current or former client "to the disadvantage of [the] client." RPC 1.6(a); *see also Nyquist*, 590 F.2d at 1246 (disqualification "has been ordered . . . where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation[.]"). But defendants do not contend that Miller ever represented them, in any capacity. Consequently this cannot be the basis of their confidentiality argument. Alternatively, if defendants' concern is that Miller may use information provided by plaintiffs "to advance a position that ECC might not necessarily adopt if it had truly independent counsel," Def. Mem. at 8, that is not a confidentiality argument at all. Rather, it is a restatement of their conflict-of-interest argument, which fails for the reasons set forth above.

Having failed to demonstrate an actual conflict between the interests of the individual plaintiffs and ECC, much less a conflict that would taint the eventual trial in this matter, defendants have not overcome this Court's "considerable reluctance to disqualify attorneys," *Razzoli*, 2021 WL 162029, at *1, nor otherwise satisfied the "high standard of proof" required to disqualify opposing counsel. *Intellipayment*, 2016 WL 1239261, at *4.

19

### C.    Sanctions

Plaintiffs request that the Court sanction defendants and their counsel, pursuant to 28 U.S.C. § 1927 and its inherent powers, because the disqualification motion was a "transparently abusive ploy" meant to "delay and divert Plaintiffs from litigating – and the Court from deciding – the underlying merits of the parties' dispute." Pl. Opp. at 14-15.

Section 1927 provides that: "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986). Thus, imposition of a sanction under § 1927 – as under the Court's inherent power – "requires a 'clear showing of bad faith'." *Id.* (quoting *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1010 (2d Cir. 1986)). "[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.*; *accord Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143-44 (2d Cir. 2012).

However, "the Supreme Court has made clear that courts should impose sanctions pursuant to their inherent authority only in rare circumstances." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020). Moreover, "[t]he imposition of sanctions pursuant to a court's inherent

authority is truly discretionary." *Id.* Even where wrongdoing has occurred, "the court is not required to sanction a party or attorney[.]" *Id.* (quoting *Murray v. City of Columbus*, 534 F. App'x 479, 485 (6th Cir. 2013)).

This Court, in its discretion, declines to award sanctions in connection with the disqualification motion. Although defendants' decision to press that motion while ignoring plaintiffs' motions to dismiss and for summary judgment suggests that it was indeed "interposed for tactical reasons," *Razzoli*, 2021 WL 162029, at *1, that is not enough, standing alone, to warrant sanctions. Moreover, while defendants failed to identify any actual conflicts warranting disqualification, the close relationships among the parties, the overlapping nature of their claims and counterclaims, and the inherent difficulty of separating the interests of the all-but moribund corporation at the center of this action from the interests of the individual parties fighting to control it militate against a finding that defendants or their counsel acted in bad faith.

## IV.    CONCLUSION

For the reasons set forth above, defendants' motion to disqualify plaintiffs' counsel (Dkt. 92) is DENIED.

Dated: New York, New York
      June 10, 2025                 **SO ORDERED**.

**BARBARA MOSES**
**United States Magistrate Judge**